**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEDO PIZZA SYSTEM, INC. & LEDO )
PIZZA CARRYOUTS, INC., )
)    No. 20 CV 7350
      Plaintiffs, )
)    Judge John J. Tharp, Jr.
      v. )
)
LEDO'S INC., )
)
      Defendant.

## MEMORANDUM OPINION AND ORDER

This case presents a hot and ready trademark dispute between two pizza companies: the plaintiffs, Ledo Pizza Systems Inc. ("Systems"), and Ledo Pizza Carryouts, Inc. ("Carryouts") (collectively, the "plaintiffs"), which operate over one hundred franchised pizza restaurants across the Mid-Atlantic and Southeastern United States, and the defendant, Ledo's Inc. (the "defendant"), a family-owned pizza restaurant located in Countryside, Illinois. The parties have filed cross motions for partial summary judgment. For the reasons set forth below, both motions are granted in part and denied in part.

## BACKGROUND

The following account is compiled from the parties' statements of undisputed material facts, submitted in accordance with Local Rule 56.1, unless stated otherwise. According to the plaintiffs' version of events, the mark "LEDO PIZZA" was first used in 1955 by an Adelphi, Maryland establishment, Ledo Restaurant (the "Restaurant"). Pls. Statement of Facts ¶¶ 1, 5, ECF No. 128-1. Two families opened the original Restaurant: the Marcoses and the Bealls. *Id.* ¶ 5. They chose the name "Ledo" because "it was short and sounded Italian." *Id.* ¶ 6. The Restaurant was incorporated in 1959. *Id.* ¶ 8. In 1962, the families opened a second restaurant, Fireside Beef

House, also in Maryland. *Id.* ¶ 9. Fireside began serving "Ledo Pizza" on its menu, an arrangement which was later formalized pursuant to a 1982 licensing agreement. *Id.* ¶¶ 10, 12.

In 1986, seeking to expand their operations, the families created Ledo Pizza Carryouts, Ltd., a company owned equally by each family. *Id.* ¶ 14. Shortly thereafter, the Restaurant entered into an agreement ("1986 agreement") with Carryouts transferring "all of the [Restaurant's] right, title and interest in and to the trademark 'Ledo Pizza'" to Carryouts. 1986 Agreement Ex. 8, ECF No. 128. The full text of the agreement read as follows:

> For Value Received the undersigned ("Assignor") does hereby and forever assign, set over and transfer to Ledo Pizza Carryout, Ltd., a Maryland corporation ("Assignee") all of assignor's right, title and interest in and to the trademark "Ledo Pizza" and all rights to use of the name "Ledo" in conjunction with pizza products and all rights to use of the recipe and baking process of Ledo Pizza; reserving, however, unto the Assignor all rights necessary to its (the Assignor's) continued use of said trademark, name, recipe and baking process. This Assignment shall inure to the benefit of and be binding upon the respective parties and their successors and assigns. Assignee accepts this assignment subject to the earlier June 1, 1982 license heretofore executed by Assignor in favor of Fireside Beef House, Inc. and agrees to recognize the continuing rights of the Licensee thereunder. This Assignment shall be interpreted under the laws of the State of Maryland.

*Id.* The 1986 agreement explicitly reserved for the Restaurant "all rights necessary to its continued use of said trademark, name, recipe and baking process." *Id.* As such, the Restaurant continued operating with the mark and kept the name "Ledo Restaurant."

Following the agreement, Carryouts began to grant licenses to third parties to use the LEDO mark. Pls. SOF ¶ 17, ECF No. 128-1. In 1987, Carryouts filed an application with the United States Patent and Trademark Office, trademarking "Ledo Pizza," and citing May 1955 as the date of first use based on the 1986 agreement with the Restaurant. *Id.* ¶ 1. The trademark was registered in December 1988. *Id.*

2

In 1989, the families created Systems, again jointly owned, to facilitate the creation of a Ledo Pizza franchise. *Id.* ¶¶ 21, 22. Carryouts licensed Systems to use the Ledo Pizza mark and grant licenses to franchisees. *Id.* ¶ 22. Shortly thereafter, however, a dispute broke out between the two families. The Marcoses sued the Beall family, Carryouts, and Systems, for involuntary dissolution of the two corporations (Carryouts and Systems) because of internal division within the stockholders of the corporations. 1992 Compl. Ex. J, ECF No. 123. The suit ultimately settled in 1994 and the parties agreed to several terms, including a trademark assignment agreement ("1994 agreement"). Def. SOF ¶¶ 17, 18, ECF No. 123. Per the terms of the 1994 agreement, the Bealls bought out the Marcoses from Carryouts and Systems and the Marcoses retained ownership of the Restaurant and Fireside, selling the same Ledo pizza. Pls. SOF ¶ 27, ECF No. 128-1. The terms of the settlement agreement permitted the Restaurant to continue to use the name Ledo Pizza and Ledo Restaurant, but it restricted differentiation between the Restaurant and franchisees, prohibiting the Restaurant from using the name "Original Ledo Pizza." 1994 Trademark Agreement Ex. 12, at ¶ (b)(7), ECF No. 142.

The 1994 agreement included a provision that the Restaurant and the Marcoses would not dispute Carryouts' ownership of the LEDO PIZZA mark or interfere with its USPTO registration. *Id.* ¶ (d)*.* It also contained a non-disparagement provision, prohibiting either party from making disparaging statements regarding the other's products or services. 1994 Settlement Agreement Ex. 11, at ¶ 5.3, ECF No. 142. From then on, the families' interests were officially severed in the pizza business, apart from utilizing the Ledo name.

In 2006, an accolade from the Oprah Winfrey television program reignited the animosity between the original owners of the Restaurant. The Oprah Winfrey Show named "Ledo's Restaurant" one of the best pizza places in America. Def. SOF ¶¶ 28-29, ECF No. 123.

Subsequently, Carryouts began listing the commendation on its website, claiming the award for itself and its franchisees. *Id.* ¶ 28. The Restaurant sent Carryouts a letter, stating that this alleged misrepresentation qualified as "deceptive advertising and unfair competition." *Id.* ¶ 29.

That year, sparked by the Oprah dispute, Carryouts sued the Restaurant for alleged violations of the 1994 agreement, claiming that the Restaurant sold Ledo Pizza through a catering company which was not an agreed-upon company covered by the settlement. *Id.* ¶ 30; *Ledo Pizza Sys., Inc. v. Ledo Rest., Inc.*, No. 06-3177, 2010 WL 1328538 at *1 (D. Md. Mar. 29, 2010). Further, the Restaurant published an article on its website which stated that Carryouts pizza chain did not "do justice" to the "real thing" available at the Restaurant, allegedly in violation of the settlement's non-disparagement clause. *Id.* at *4. The court found in Carryouts favor on its breach of contract claim, awarding it nominal damages of $1 per violation, while denying its remaining claims and request for injunctive relief. *Id.* at *6, 10.

Meanwhile, in Countryside, Illinois, a Chicago suburb, defendant Ledo's Pizza began operating in 1961 and was incorporated in 1972. Def. SOF ¶¶ 8, 10, ECF No. 123. James Dorgan, who worked at the restaurant at its inception as a member of the family business, testified that the name originated by combing the first two letters of the last names of the two founding families: Lenzi and Dorgan. *Id.* ¶ 36. Dorgan was not aware of anyone associated with the restaurant traveling to Maryland until he made a personal trip in the mid- to late-1970s. *Id.* ¶ 45. He further testified that Ledo's never changed its name. *Id.* ¶¶ 38, 9. According to the defendant, Ledo's Pizza has been in continuous operation since its opening. *Id.* ¶¶ 48-49.

According to the plaintiffs' account of events, they first became aware of the Illinois Ledo's Pizza in 2020 and subsequently discovered that Ledo's Pizza shipped pizzas nationwide.[1] Pls. SOF ¶ 33, ECF No. 128-1. After sending a cease-and-desist letter to the defendant in 2020, to which the defendant responded by asserting its right to use the Ledo mark as an intermediate user, the plaintiffs filed the instant action. Cease and Desist Letter Ex. A, ECF No. 16.

The plaintiffs allege trademark infringement, unfair competition, and common law unfair competition trade name infringement. Compl., ECF No. 1. In response, the defendant raised several affirmative defenses and countersued the plaintiff for trademark infringement, unfair competition, violations of the Illinois Deceptive Trade Practices Act, Illinois Consumer Fraud Act, and to cancel the plaintiff's registration of the LEDO mark. Am. Answer & Countercls., ECF No. 113. The defendant also sought a declaration that it is an intermediate junior user pursuant to 15 U.S.C. § 1115(b)(5). *Id.*

The parties filed cross motions for partial summary judgment. The defendant moved for summary judgment on its claim that it is the senior user of the LEDO mark because the 1986 Agreement constituted an assignment in gross and did not include the good will associated with the LEDO trademark. In the alternative, the defendant moved for summary judgment on its claim that it is entitled to continue using the mark in its geographic territory as an intermediate junior user. Def. Mot. for Summ. J., ECF No. 121. The plaintiffs filed their own motion for summary judgment on Counts II-IX of the defendant's counterclaims, excluding only its junior user claim,

---

[1] In response, the defendant asserts that the plaintiffs became aware of the Illinois Ledo's nearly fifteen years earlier than they initially claimed, when an individual informed a member of the Carryouts/Systems business that a restaurant was operating in Illinois under the same name. James Beall Dep. Ex. C, at 53:1-7, ECF No. 148. Carryouts/Systems did not find anything to confirm this fact upon conducting a cursory search online and dropped the issue. *Id.* at 54:24-25.

and affirmative defenses four, five, and six,[2] which touch on similar subject matters as the defendant's counterclaims. Pls. Mot. for Summ. J., ECF No. 125. The plaintiff also filed a motion to exclude the defendant's expert, Susan Meyer, for offering improper legal conclusions in her expert report. Mot. to Strike, ECF No. 129.

## DISCUSSION

Summary judgment is proper when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The usual Rule 56 standard of review applies to cross-motions for summary judgment." *Int'l Bhd. of Elec. Workers, Loc. 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). When it comes to cross-motions, the Court "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Fs., Inc.*, 246 F.3d 975, 983 (7th Cir. 2001).

## I. Whether the 1986 Agreement Transferred the LEDO Mark to Carryouts.

The first issue that the Court must resolve is whether the 1986 agreement to transfer the "Ledo Pizza" mark from the Restaurant to Carryouts was an invalid assignment in gross. If the

---

[2] The defendant's affirmative defenses raised here are as follows. In affirmative defense four, the defendant alleges that the plaintiff abandoned the LEDO mark by extending naked licenses to third parties and failing to enforce quality control measures. Am. Answer & Countercl. 18, ECF No. 113. Affirmative defense five alleges that the defendant is the senior user of the mark, having opened its doors in 1961, because the 1986 Agreement constituted an assignment in gross and is therefore a nullity. *Id.* at 19. This defense correlates to the defendant's counterclaims in Count II for trademark infringement based on its assertion that it is the senior user. *Id.* at 29. Affirmative defense six, which reflects the substance of the defendant's counterclaim Count VII, alleges that Ledo's trademark registrations, citing 1955 as the date of first use based on the 1986 Agreement, are fraud on the U.S. Patent and Trademark Office and therefore invalid. *Id.*

1986 agreement is valid, then Carryouts is the senior user of the mark because it adopted the date of first use—1955—from the Restaurant with the assignment. *See Medscript Pharmacy, LLC v. D&D Pharma LTC, LLC*, 444 F. Supp. 3d 909, 914 (N.D. Ill. 2020) ("A valid assignment entitles the assignee to 'step into the shoes' of the assignor and gain whatever priority the assignor might have had in the mark.") (internal citation omitted). In contrast, if the 1986 agreement is invalid as an assignment in gross, because the good will associated with the mark did not transfer from the Restaurant to Carryouts, then the defendant is the senior user (as compared to Carryouts), adopting 1961 as the first use date. Both parties moved for summary judgment on this issue.

*Transfer of Good Will*

The transfer of a trademark is an assignment in gross, and therefore invalid, if the assignor transferred the right to use mark, but not the good will associated with the mark. *Visa, U.S.A., Inc. v. Birmingham Tr. Nat. Bank*, 696 F.2d 1371, 1375 (Fed. Cir. 1982). A trademark assigned without the associated good will is meaningless—it is a word or phrase without the associated consumer value. *Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025, at *5 (N.D. Ill. July 12, 2001). Good will is "the advantage obtained from use of a trademark," which includes "the public's name recognition of the product that differentiates it from others." *Medscript Pharmacy, LLC*, 444 F. Supp. 3d at 914.

An assignment will be upheld, "so long as the transaction ensures that there is a continuity of good will and a meeting of consumer expectations as to the nature and quality of the goods or services sold by the assignee." 3 McCarthy, *Trademarks and Unfair Competition*, § 18:3 (5th ed.). This is not a rigid, inflexible inquiry; the rules were not established with "the purpose of invalidating all trademark assignments which do not satisfy a stereo-typed set of formalities." *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir. 1982). Accordingly, the

agreement does not need to include the transfer of tangible assets and a provision providing for the transfer of good will is not dispositive. *Id.*; *Archer*, 2001 WL 804025, at *6 ("[T]he mere fact that the assignment document recites that good will was assigned along with the mark is not dispositive."). Instead, "courts look to the reality of the transaction to see if good will has passed." *Id.*; 3 McCarthy, § 18:24.

General principles of contract law can be applied to determine whether good will transferred with the assignment. 3 McCarthy, § 18:4 ("[T]he issue of whether a transaction constitutes a transfer of trademark rights will be determined by applying the usual rules of contract law."). Maryland law governs the 1986 agreement and adheres to an objective theory of contract interpretation. 1986 Agreement Ex. H, ECF No. 123 ("This Assignment shall be interpreted under the laws of the State of Maryland."). Under Maryland law a court must examine, "what a reasonable person in the position of the parties would have meant at the time [the agreement] was effectuated." *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985). This analysis is based on "the clear and unambiguous language of [the] agreement." *Id.*

Examining the language of the 1986 agreement, the Restaurant assigned "all of [its] right, title, and interest in and to the trademark 'Ledo Pizza'" to Carryouts. 1986 Agreement Ex. H, ECF No. 123. As the defendant notes, "[t]he agreement never mentions goodwill and does not purport to assign Restaurant's good will to LPC along with the mark," but "[a]ssignments of trademark rights do not have to be in writing," to begin with, so this fact is not dispositive. Def. Mot. for Summ. J. 5, ECF No. 122. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997). Furthermore, the assignment was executed subject to the preexisting 1982 license to Firehouse and a reservation to the Restaurant for its "continued use of said trademark, name, recipe and baking process." *Id.* Implicit in this carve out permitting continued use of the mark by the

Restaurant and Firehouse is the exclusion of use of the mark by anyone else other than Carryouts (or its assignees)—an exclusion that ensures that there will be a continuity of good will and a meeting of consumer expectations as to the nature and quality of the goods or services sold under the mark.

As further evidence that the assignment included good will, the transfer of the mark was granted "in conjunction with pizza products and all rights to use of the recipe and baking process of Ledo Pizza," which is the product upon which the good will associated with the mark was built. 1986 Agreement Ex. H, ECF No. 123. One factor courts consider in evaluating a transfer agreement is "whether the assignee continues to produce goods of the same nature and quality previously associated with the mark." *Archer*, 2001 WL 804025 at *7. Along with the right to use the LEDO mark, the Restaurant transferred the right to the recipe and pizza-making process—the key elements to create a Ledo pizza—to Carryouts. *See Cobra Cap. LLC v. LaSalle Bank Corp.*, 455 F. Supp. 2d 815, 820 (N.D. Ill. 2006) (finding that where the assignee continued to make the same product after the trademark assignment "consumer deception or confusion [was] not an issue."); *see also Visa*, 696 F.2d at 1376 ("[T]he transfer of goodwill requires only that the services be sufficiently similar to prevent consumers of the service offered under the mark from being misled from established associations with the mark.") (cleaned up).

The reality of the transaction demonstrates the objective intent to transfer the good will with the mark to Carryouts. Prior to the agreement, the families decided to expand their operations and jointly created the Carryouts corporation to serve this purpose. Garth E. Beall Aff. Ex. 3, at ¶ 15, ECF No. 128. Following the transfer, Carryouts eventually developed a franchise system, resulting in the creation of Systems, which extends licenses to franchisees to make Ledo pizza and use the LEDO mark. Pls. Mot. for Summ. J. 13, ECF No. 128. Therefore, considering the plain

language of the agreement, as well as the reality of the transaction at the time it was executed, the Court concludes that the good will associated with the LEDO mark transferred from the Restaurant to Carryouts in the 1986 Agreement.

The defendant raises several arguments to support its claim that the 1986 agreement is invalid. First, the defendant argues that the reservation to the Restaurant, allowing it to continue using the LEDO mark, demonstrates that the good will did not transfer to Carryouts. Def. Mot. for Summ. J. 5-6, ECF No. 122. By "continuing in the same business under the same mark," the Restaurant retained the good will associated with the mark, resulting in an assignment in gross to Carryouts. *Id.* at 6. The Restaurant's right to continue using the mark does not automatically invalidate the assignment to Carryouts. Instead, as the plaintiffs contend, the Restaurant assigned the mark and its good will to Carryouts and, at the same time, retained a license to continue using the mark. Pls. Mot. for Summ. J. 11, ECF No. 128; 3 McCarthy, § 18:9; *see also Visa*, 696 F.2d at 1376 ("A license back of an assigned mark to enable the assignor-licensee to continue to conduct the same business or provide the same services under the mark is not a novelty."). As noted above, this arrangement does not threaten the continuity of good will or undermine consumer expectations as to the nature and quality of the goods or services sold by Carryouts.[3]

Second, the defendant argues that the subsequent litigation, between the Marcoses and Bealls in 1994, and between the Restaurant and Carryouts/Systems in 2006, indicates that the good will did not transfer with the 1986 agreement. According to the defendant, this breakdown of the original ownership illustrates that the Restaurant and Carryouts had separate good wills because

---

[3] The defendant also argues that the alleged license to the Restaurant is invalid as a naked license because the plaintiffs failed to exercise any oversight over the Restaurant. Def. Resp. to Pls. Mot. for Summ. J. 8-9, ECF No. 136. This argument will be addressed more fully in Section IV *infra*.

they "staked out and defended their good wills and territories." Def. Mot. for Summ. J. 6, ECF No. 122. It is true that the 1992 litigation resulted in the 1994 settlement agreement, establishing separate ownership of the Restaurant and Carryouts/Systems. *Id.* at 7. But the subsequent dispute between the Restaurant and Carryouts is not indicative that, six years earlier, at the time of the agreement in 1986, the Restaurant did not intend to transfer the good will associated with the mark. An agreement is interpreted according to what a reasonable person "would have meant at the time it was effectuated"—it is not interpreted based on a subsequent breakdown in relationship of the contracting parties. *General Motors*, 492 A.2d at 1310.

Third, and relatedly, the defendant cites to a case which it claims is analogous from the Eastern District of Michigan, *Liquid Glass Enterprises, Inc. v. Liquid Glass Indus. of Canada*. No. 88-71510, 1989 WL 222653 (E.D. Mich. Apr. 28, 1989). In that case, the assignee agreed not to pursue the assignor's customers and to use the mark in the separate Canadian market. *Id.* at *5. Based on these facts, the court found that any supposed transfer of good will was "illusory." *Id.* As the defendant describes the 1994 agreement, the same thing happened here. Def. Mot. for Summ. J. 10-11, ECF No. 122. The Restaurant and Carryouts agreed to a division of territory where each could operate, separating customer markets. 1994 Settlement Agreement Map Ex. N, ECF No. 123. However, as the plaintiffs point out, *Liquid Glass* involved a division of territory *at the time of assignment*, which is not the case here. Pls. Resp. to Def. Mot. for Summ. J. 14, ECF No. 141. When the 1986 transfer agreement was reached, there was no territorial limitation on Carryouts' ability to utilize the LEDO mark. 1986 Agreement Ex. H, ECF No. 123. This makes sense. At the time, the Marcoses and Bealls jointly owned the Restaurant and Carryouts, so there was no need to distinguish between the two entities' use of the mark.

11

The plaintiffs are therefore entitled to summary judgment on the defendant's fifth affirmative defense, which relies on the defendant's theory that it is the senior user of the mark because the 1986 agreement is an invalid assignment. Am. Answer & Countercls., ECF No. 113. Having found that the 1986 agreement is not invalid, the defendant's remaining arguments relying on its contention that the 1986 agreement was an assignment in gross fail.[4]

## II. Whether Carryouts' Trademark Registrations are Void Under 15 U.S.C. § 1051(a)(1) and 15 U.S.C. § 1115(b)(1).

The plaintiffs moved for summary judgment on the defendant's affirmative defense and counterclaims that Carryouts' trademark registrations should be invalidated as fraudulently submitted to the USPTO. Pls. Mot. for Summ. J. 13, ECF No. 128. To state a claim for fraud on the USPTO, the statement "cannot be merely false, but must be intentionally false." *Slep-Tone Ent. Corp. v. Coyne*, 141 F. Supp. 3d 813, 826 (N.D. Ill. 2015) (internal citation omitted). A party seeking to cancel a trademark for fraud "bears a heavy burden of proof" and must prove its claim with "clear and convincing evidence." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009).

The defendant's fraud claim fails even to get out of the starting blocks, because the defendant has failed to adequately establish standing to assert the claim.[5] A petition to cancel a mark must "be filed . . . by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution." 15 U.S.C. § 1064. The party must "demonstrate a real interest in the proceeding and a reasonable belief of damage." *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1374 (Fed. Cir. 2020). A party can establish a reasonable belief

---

[4] This includes the defendant's argument that the trademark registrations are void *ab initio* because they were not filed by the proper owner of the mark. Def. Resp. to Pls. Mot. for Summ. J. 19, ECF No. 136.

[5] Standing is a jurisdictional issue and should be addressed by the Court even where not raised by the parties. *Hay v. Indiana State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002).

of damage, "by producing and selling merchandise bearing the registered mark." *Id.* at 1375; *see also Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000) ("A belief in likely damage can be shown by establishing a direct commercial interest."). Here, the defendant alleged only that "Ledo's has been and will continue to be damaged as a result of Plaintiffs' fraudulent conduct before the USPTO." Am. Answer & Countercls. ¶ 109, ECF No. 113. Although standing is a "low-threshold, intended only to ensure that the plaintiff has a real interest in the matter," the petitioner still carries the burden to plead or prove facts "showing a 'real interest' in the proceeding." *DRL Enterprises, Inc. v. N. Atl. Operating Co., Inc.*, 301 F. Supp. 3d 824, 834 (N.D. Ill. 2018) (internal citation omitted); *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1092 (Fed. Cir. 1984). The defendant's statement that it "has been and will continue to be damaged" is insufficient to establish a "reasonable belief of damage" such that the defendant has standing to petition for cancellation, particularly where the defendant operates in a distant geographic territory from the plaintiff. *Id.*

Even if the defendant had standing to assert it, the fraud claim still fails. The defendant alleges that Carryouts made two fraudulent statements when it filed its application to register the mark. First, the defendant claims that because the 1986 agreement is a nullity, Carryouts' citation to 1955 as the date of first use, based on the Restaurant's use of the LEDO mark, is fraudulent. Second, at the time Carryouts filed the trademark application, both Firehouse and the Restaurant had the right to use the mark, but Carryouts did not list these licenses on its application. Def. Resp. to Pls. Mot. for Summ. J. 13-14, ECF No. 136. According to the defendant, "[t]here is no plausible way for Robert M. Beall to both sign an agreement that Restaurant specifically reserved rights to use the . . . name and marks, and then turn around and represent under oath to the USPTO ten months later that LPC was the exclusive owner." *Id.* at 14.

As an initial matter, the defendant's first allegation of fraud fails given the Court's finding that the 1986 agreement was not an invalid assignment in gross. *See* Section I *supra*. When it comes to the second claim, that Robert Beall failed to include the licenses extended to Firehouse and the Restaurant in the application, there is no evidence that Mr. Beall intentionally sought to deceive the USPTO. Under the defendant's version of events, there is no possible motive for Mr. Beall's omission on the application other than to mislead the USPTO. Def. Resp. to Pls. Mot. for Summ. J. 18, ECF No. 136. That question assumes that Beall had a motive to omit the information, but assumptions are not evidence. As the plaintiffs reasonably ask, "why would [Beall] in 1987 attempt to deceive the Trademark Office by hiding the fact that he had licensed another related entity—an entity he owned and operated with the other co-owner of the brand—to use the Mark?" Pls. Mot. for Summ. J. 15, ECF No. 128. Even after discovery, the defendants don't have a good answer and their inability to point to evidence that provides one dooms their fraud claim; a jury verdict finding fraud based solely on an inaccurate statement could not stand. The standard is not whether the filer "should have realized" the mistake. That would "erroneously lower[] the fraud standard to a simple negligence standard." *In re Bose Corp.*, 580 F.3d at 1244.

In addition to intent to deceive, a false statement must be material to warrant cancellation of a mark, meaning that "but for the misrepresentation, the federal registration either would not or should not have issued." 6 McCarthy, § 31:67. Though neither party discusses this element in great detail, the Court briefly notes that the defendant fails to establish a genuine dispute of material fact that Beall's omission of the preexisting licenses on the trademark application was material. The existence of a preexisting license is the opposite of a disqualifying factor, because "[w]here . . . a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration." 15 U.S.C. § 1055. Licensees are

considered related companies under the Lanham Act. 15 U.S.C. § 1127 (A related company is "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services."). Therefore, because the Court finds that the license from Carryouts to Restaurant was not a naked license in Section IV *infra*, the omission of the license agreement on the trademark application does not qualify as material because it would not be disqualifying.

The party alleging fraud on the USPTO bears the burden of adducing clear and convincing evidence of fraudulent intent; the defendant has adduced none. *In re Bose Corp.*, 580 F.3d at 1243. Accordingly, there is no genuine dispute of material fact such that a reasonable jury could find the plaintiffs intentionally deceived the USPTO when filing its application to register the LEDO mark or that the false statement was material to the application. Therefore, the plaintiffs' motion for summary judgment on the defendant's sixth affirmative defense and Counts VII, VIII, and IX of the defendant's counterclaims is granted.

III.   **Whether the Defendant Qualifies as a Protected Intermediate User Under 15 U.S.C. § 1115(b)(5).**

The defendant moved for partial summary judgment on its counterclaim that it is entitled to intermediate user status under the Lanham Act in a geographic area of prior use. Am. Answer & Countercls. 28, ECF No. 113; Def. Mot. for Summ. J. 12, ECF No. 122. Under § 1115(b)(5), a party may continue to use a registered mark in a limited geographic trade area, despite the existence of a senior user, provided that certain conditions are met. "[T]he party without the federal registration must prove its prior and continuous rights in a market that preempts the registrant's constructive nationwide rights." *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, No. 03 C 6070, 2004 WL 2967446, at *10 (N.D. Ill. Nov. 15, 2004).

There are four elements to assert this defense:

> To establish the . . . limited area defense, defendant (intermediate junior user) must prove (1) that its (or its assignor's) original adoption and first use of the mark was in a 'remote' area; without knowledge of plaintiff's prior use or was otherwise in 'good faith'; (2) that it can trace use or title back to a date of original adoption and use prior to the date of plaintiff's federal application or registration; (3) that its use has been continuous in area X since that time; and (4) the extent of trade area X either at the time plaintiff's federal registration issued or at the time of a post-1989 application.

5 McCarthy, § 26:44.

To establish junior user status, the defendant must demonstrate that it adopted the mark without knowledge of its prior use. *See* 5 McCarthy, § 26:9 ("[P]roof of the junior user's knowledge of the senior user's mark at the critical date is sufficient to destroy the 'good faith' element of the territorial defense."). In this case, there is no genuine dispute of material fact regarding the knowledge of the defendant at the time it adopted the name Ledo's Pizza in 1961. One of the family members who worked for the defendant's business, James Dorgan, testified that the name was formed by combining the first two letters of the founding families' last names: Lenzi and Dorgan, making Ledo's which sounded "very Italian." James Dorgan Dep. Ex. E, at 9-10, ECF No. 123. Mr. Dorgan further testified that he was not aware of anyone associated with the restaurant traveling to Maryland, where they might have seen the Ledo Restaurant operating in Adelphi, before he took a personal trip to Maryland in the 1970s. *Id.* at 25-26.

Contrary to the plaintiffs' assertions, there is no "credibility" issue or genuine dispute of material fact that prevents the Court from crediting Mr. Dorgan's uncontroverted testimony at this stage. Pls. Resp. to Def. Mot. for Summ. J. 15, ECF No. 141; *see Waldon v. Wal-Mart Stores, Inc., Store No. 1655*, 943 F.3d 818, 823 (7th Cir. 2019) ("Criticizing the credibility of the movant's affiants, alone, is not enough to avoid summary judgment."). To stave off summary judgment, the plaintiffs must adduce evidence that counters that offered by the defendant, but they have failed to do so. There is nothing in the record to suggest that in 1961 the two families who opened Ledo's

Pizza in Countryside, Illinois, were aware that a Ledo Restaurant in Adelphi, Maryland had opened six years earlier. The defendant has therefore established innocent use of the LEDO mark beginning in 1961, prior to Carryouts' registration of the mark in 1988.

In addition to demonstrating innocent adoption of the mark, the defendant has the burden to prove continuous use to establish intermediate user status. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 762 (9th Cir. 2006) ("Where usage is interrupted, the innocent-use defense 'dries up,' precluding the innocent user from asserting trademark rights in those areas."). There is no genuine dispute of material fact as to the defendant's continuous use of the LEDO mark from 1961 to the present in Countryside, Illinois. The defendants cite to numerous pieces of evidence to establish continuous use, including: testimony from family members who worked at the restaurant over several decades, phone books listing Ledo's Pizza spanning a period of years from 1964-1999, newspaper advertisements for Ledo's Pizza spanning 1973-1988, an Illinois corporation report which lists Ledo's Inc.'s duration date as "perpetual," and an award from Illinois Comptroller to Ledo's Pizza celebrating fifty years in business. James Dorgan Dep. Ex. E, at 16:19-20, ECF No. 123; Jeannine Dorgan Decl. Ex. F, at ¶ 6; Telephone Directories Exs. T1-T6; Newspapers Ex. U; Ill. Corp. Certificate Ex. G; Illinois Comptroller Award Ex. H, ECF No. 148. Continuous use has been established.

The final element is proof of operation in a limited geographic territory. The plaintiffs argue that the defendant "has not submitted sufficient evidence and has made no argument to the extent of its trade area in 1988." Pls. Resp. to Def. Mot. for Summ. J. 16, ECF No. 141. Establishing a defined trade area is necessary because the intermediate junior user defense is limited to "the area in which such continuous prior use is proved." 15 U.S.C. § 1115(b)(5); *see also Safeway Stores, Inc. v. Safeway Quality Foods, Inc.*, 433 F.2d 99, 104 (7th Cir. 1970) (holding

that the defendants could continue to use a mark in the area where they operated prior to the plaintiff's registration of the mark); *Pure Imagination Inc.*, 2004 WL 2967446, at \*11 ("At the point in time of registration, the junior user's current market—it's area [of] continuous prior use, is frozen.") (cleaned up).

According to Jeannine Dorgan's declaration, Ledo's Inc. currently does business in several cities in Cook and DuPage counties.[6] Jeannine Dorgan Decl. Ex. F, at ¶ 8, ECF No. 123. It still operates the singular brick-and-mortar location in Countryside, Illinois which it has occupied since 1973.[7] James Dorgan Dep. Ex. E, at 9:15-17, ECF No. 123. The defendant also provided evidence of its newspaper advertisements and listings in telephone books for the near west suburbs of Chicago, which include several years predating Carryouts' registration of the mark. Telephone Directories Exs. T1-T6, ECF No. 123. This is sufficient evidence to establish the continuous use of the mark in a trade area, though its exact boundaries have not yet been established by the defendant. *See S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 666 (7th Cir. 2016) ("A wide variety of sources may demonstrate 'use' sufficient for public identification of a mark, including 'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications, as well as in media outlets such as television and radio.'") (internal citation omitted). The defendant, in its motion, goes on to assert that "the full extent of [the trade area] will be shown at trial." Def. Reply 19, ECF No. 147. At this stage, the Court can grant the defendant's motion

---

[6] The cities listed include Countryside, La Grange, La Grange Park, Brookfield, Hodgkins, Western Springs, Westchester, Lyons, McCook, Willow Springs, Indian Head Park, Hinsdale, Burr Ridge, Westmont, Downers Grove, and Oak Brook. The declaration notes that Ledo's in Countryside will deliver outside of these boundaries for larger orders, including to Chicago, Westmont, Downers Grove, and Oak Brook. Decl. of Jeannine Dorgan Ex. F, at ¶ 8, ECF No. 123.

[7] The original location, which opened in 1961, was located directly across the street from the current location. James Dorgan Dep. Ex. E, at 9:5-17, ECF No. 123.

for partial summary judgment on its claim that it is an intermediate junior user, subject to the later determination of its geographic area of prior use.

In addition to the arguments raised above, the plaintiffs state that the defendant is not entitled to junior user status because the defendant ships its pizzas online, which could result in sales to customers outside of its local area of prior use. Although the impact of internet sales on junior user status is a more complicated issue, the law is clear that the internet itself is not a territory that is capable of being claimed. *See* 5 McCarthy, § 26:30.50 ("Merely being the senior user of a mark on the internet does not thereby create an exclusive right to the mark for internet use in all territories of the United States (or the world). The internet (or cyberspace) is not a 'territory.'"). "Market penetration by internet use of a mark should be determined, primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site." *Id.* § 26:1.50. In this case, there is no evidence in the summary judgment record to establish the existence or extent of the defendant's internet sales and whether they extend outside the area of prior use. Therefore, this fact does not preclude the Court's decision to grant partial summary judgment in favor of the defendant.

## IV. Abandonment Through Naked Licensing.

The plaintiff moved for summary judgment on the defendant's affirmative defense that the plaintiff abandoned the LEDO mark by licensing the mark to the Restaurant without exercising sufficient oversight. Pls. Mot. for Summ. J. 17, ECF No. 128. "If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device," resulting in its abandonment. *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) (internal citation omitted). The Seventh Circuit adheres to a "flexible approach" in analyzing naked licensing claims, however, such that "[a]bsent a significant deviation from the licensor's quality standards" courts should not find that

the licensor abandoned the mark. *Id.* at 885-86. A party seeking the cancellation of a mark for naked licensing faces a "heavy burden." *Slep-Tone Ent. Corp. v. Coyne*, 141 F. Supp. 3d 813, 824 (N.D. Ill. 2015).

The plaintiffs' primary response is that the Restaurant qualifies as a "related company" under the Lanham Act, such that its use of the LEDO mark "inure[s] to the benefit of the registrant," because the Restaurant and Carryouts were subject to the same ownership by the Marcoses and Bealls. Pls. Mot. for Summ. J. 18, ECF No. 128; 15 U.S.C. § 1055. Therefore, any use of the mark by the Restaurant benefitted Carryouts, even if it did not conduct proper oversight of the licensee. A related company is "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. In evaluating the relationship between licensor and licensee, "[t]he key term is 'controlled,'" not whether the companies were owned by the same individuals. *Slep-Tone*, 141 F.Supp.3d at 824. "[T]he mere fact that two corporations have the same stockholders, directors, or officers," does not automatically give rise to a related company relationship. 3 McCarthy, § 18:51, *citing* Trademark Manual of Examining Procedures § 1201.03(c): Common Stockholders, Directors, or Officers (Oct. 2017 ed.). As such, the plaintiffs cannot avoid the defendant's naked licensing claim simply by characterizing the Restaurant as a related company under the Lanham Act.

That said, the characterization of the 1986 agreement as a naked license is questionable. Although the agreement does not expressly vest control of the Restaurant's pizza-making operations with Carryouts, it does expressly contemplate that the Restaurant will continue to use "the recipe and baking process of Ledo Pizza." Further, "[w]here the license parties have engaged in a close working relationship . . . and no actual decline in quality standards is demonstrated," it

would undermine "the purpose of the law to find an abandonment simply for want of all the inspection and control formalities." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd on other grounds* 505 U.S. 763 (1992) (holding that the familial relationship between the two parties using the same trade dress warranted "the relaxation of formalities" governing the licensor-licensee relationship). Put another way, the defendant has provided no evidence "from [] which a reasonable jury could conclude that there was a deviation in the quality . . . or that [the plaintiff] was unjustified in relying on the licensee's expertise." *Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 1927701 at *4 (N.D. Ill. May 10, 2017). To the contrary, the Restaurant won a 2006 award from the Oprah Winfrey show for serving some of the best pizza in the United States. Def. SOF ¶ 28, ECF No. 123. To be sure, it is not the case "that 'high quality' permits unsupervised licensing." *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 790 (7th Cir. 2011). But licensors may rely "at least somewhat on the reputation and expertise of licensees." *TMT North America*, 124 F.3d at 885. In this case, the Restaurant was the original entity that developed the Ledo pizza style and after the 1986 agreement the Restaurant continued to be operated by the same individuals who owned Carryouts. Therefore, any reliance by Carryouts on the continued quality of the Restaurant's Ledo pizza is justifiable.

Because the defendant failed to present evidence of a genuine dispute of material fact such that a reasonable jury could find that the plaintiffs abandoned the LEDO mark through a system of naked licensing, the plaintiffs' motion for summary judgment on the defendant's abandonment defense is granted.

## V.    The Defendant's Counterclaims Under Illinois and Common Law.

The plaintiffs moved for summary judgment on Counts II-VI of the defendant's counterclaims. The defendant alleged violations of the Lanham Act, the Illinois Deceptive Trade Practices Act, the Illinois Consumer Fraud Act, as well as claims for common law trademark

infringement and unfair competition. Am. Answer & Countercls. Counts II-VI, ECF No. 113. The plaintiffs make the conclusory connection that these claims "rely upon the success of one of the Defendant's legal theories above," therefore entitling the plaintiffs to summary judgment. Pls. Mot. for Summ. J. 20, ECF No. 128. This is not sufficient reason to grant summary judgment on the defendant's counterclaims; even if the 1986 agreement constituted a valid assignment to Carryouts and the defendant is not the senior user, the defendant may pursue many of these claims because it can make a claim for infringement in a trade area where it acquired prior user status. *See DeRosier v. 5931 Bus. Tr.*, 870 F. Supp. 941, 948 (D. Minn. 1994) ("While the Defendants' use of their properly registered service mark is otherwise 'incontestable,' . . . that use must bow, within a circumscribed geographic area, to a prior user's adoption of the same or a confusingly similar service mark."). Therefore, the plaintiffs' motion for summary judgment is denied as to these counts.

    **A.    The Defendant's Claims for Damages.**

Apart from the substance of these claims, the plaintiffs moved for summary judgment on the defendant's counterclaims for monetary damages because the defendant failed to provide the evidentiary basis for its alleged damages. In response to the plaintiffs' interrogatory requesting that the defendant categorize and itemize its "damages and irreparable injury," the defendant stated: "To the extent that Plaintiffs will attempt to enter Ledo's market using the Ledo name, such use will cause confusion among the relevant consuming public as to the affiliation between Ledo's and plaintiffs." Pls. Reply 9-10, ECF No. 150. The defendant's phrasing of its alleged damages is problematic and raises another standing issue—"[t]o the extent that plaintiffs will attempt to enter Ledo's market"—is purely speculative and falls short of establishing a "concrete and particularized" injury. *Id.*; *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Though monetary damages are available under the Lanham Act, "[t]he primary

limiting principle is that the damages may not be speculative," and the party seeking damages must provide some evidence of harm. *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1353 (11th Cir. 2019). And, again, even if it were sufficient to provide standing, the defendant's response does not provide the specificity required to survive summary judgment, nor does it meet the standard for mandatory disclosures set in Fed. R. Civ. P. 26(a)(1)(A)(iii). "As courts have held in a variety of contexts, a nonmovant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgment against that party." *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 767 (N.D. Ill. 2005).

In response, the defendant argues that if it establishes senior user status or limited rights in the mark under § 1115(b)(5), "then Ledo's will seek damages and Plaintiffs' profits from sales of products through Plaintiffs' website," as to which it secured evidence during discovery. Def. Resp. to Pls. Mot. for Summ. J. 20, ECF No. 136; Ledger of Plaintiffs' Franchisee Website Sales to Illinois Residents Ex. B, ECF No. 139. Further, as to Count II under the Lanham Act, the defendant states that it not only seeks damages, but the plaintiff's profits and the costs of the legal action based on § 1117(a). Def. Resp. to Pls. Mot. for Summ. J. 20, ECF No. 136. If a violation is established, the plaintiff may recover the defendant's profits, any damages sustained, and the costs of the legal action. 15 U.S.C. § 1117(a). The defendant has provided evidence that the plaintiff has generated revenue by selling goods to Illinois residents, so this damages claim is sustained.[8] The

---

[8] In reply, the plaintiffs argue that the defendant's evidence of plaintiffs' profits refers to "a list of Plaintiffs' franchisees' internet sales," which "is not evidence that is competent under 15 U.S.C. § 1117(a)." Reply 9, ECF No. 150. In support of its argument that evidence of franchisee profits is insufficient to support a claim for profits under § 1117(a), the plaintiffs cite to the statute's language which provides that to assess profits, the party seeking profits "shall be required to prove defendant's sales only." This language does not support the inverse proposition that evidence of franchisee sales cannot serve as evidence of recoverable profits.

The plaintiffs also assert in reply that the defendant's claim for profits is barred by 15 U.S.C. § 1111 which provides that "in any suit for infringement . . . by such a registrant failing to

remaining counts, however, allege damages based on "lost business and potential business," without any evidence of the alleged lost business. Am. Answer & Countercls. 32-34, ECF No. 113. Therefore, the plaintiffs' motion for summary judgment on these damages claims in Counts III-VI is granted.

## VI.   The Plaintiffs' Motion to Exclude the Defendant's Expert.

The plaintiffs filed a motion to exclude the defendant's expert, Ms. Susan Meyer, a lawyer who specializes in trademark law, for offering determinative legal conclusions in her expert report. Mot. to Strike 2-3, ECF No. 129. Examining Ms. Meyer's report, its conclusions address the same issues that the Court has resolved in this opinion, namely the character of the 1986 agreement, the factors relevant to the defendant's intermediate junior user status, and whether the plaintiffs extended a naked license to the Restaurant. Meyer Expert Op. 16-18, ECF No. 132-2. As the Court has resolved these issues without reference to Ms. Meyer's opinions, the plaintiffs' motion to strike the defendant's expert is denied, without prejudice, as moot. The plaintiffs may reassert their

---

give such notice of registration, no profits and no damages shall be recovered . . . unless the defendant had actual notice of the registration." Reply 10, ECF No. 150. In the plaintiffs' view, because a holder of a registered mark cannot make a claim for profits if it failed to "properly display the mark to notify potential infringers . . . [a] holder of a non-registered mark should not be given any greater rights." *Id.* This argument was raised in the first instance in the plaintiffs' reply brief and is therefore waived, "given the lack of opportunity for the other party to respond to [it]." *Peterson v. Vill. of Downers Grove*, 103 F. Supp. 3d 918, 925 (N.D. Ill. 2015).

motion in advance of trial if the defendant's intention to offer Ms. Meyer's testimony at trial persists.

*     *     *

For the foregoing reasons, the plaintiffs' partial motion for summary judgment is granted in part and denied in part and the defendant's partial motion for summary judgment is granted in part and denied in part. The plaintiffs' motion to exclude the defendant's expert is denied as moot.

Date: March 7, 2024

John J. Tharp, Jr.
United States District Judge

25